Thank you, Your Honor. Dennis Reardon for Appellant Swaid. Addressing first the issue of the insufficiency of the evidence on the ITSP count, I think we have to look at and distinguish forms of liability when someone doesn't personally commit a crime. Let me call them vicarious liability documents, and they really come in two stripes. I mean, one, if somebody conspires to commit a specific crime and a member of the conspiracy commits it, they're guilty of the substance of the crime. And in that situation, the government has proven that they had the intent to commit that specific crime. They knew it was going to be committed. They agreed it could be committed. Similarly, aiding and abetting, in a direct sense, you know someone's going to commit a crime. You intend to have them commit the crime. You aid them. In both of those situations, knowledge and intent to commit the specific crime are required and proven. But then we get what I call indirect theories of vicarious liability. There are situations in which you can be convicted of a crime that you did not know was going to be committed and that you didn't intend specifically to commit. Strict liability is one, but obviously the Pinkerton Doctrine is another. But the Pinkerton Doctrine has specific requirements. It's the only doctrine of what we call an indirect vicarious liability. Tell me if I've got the facts right on this. I'm having trouble applying the argument you're making, which I think is correct, to the facts. If I understood the facts right, Suede was present when the guy at the convenience store was getting the stolen goods from the dope addicts, and Suede, and that happened more than once, and Suede paid the convenience store guy cash, and then the convenience store guy paid the dope addicts cash, and Suede told the convenience store guy that if the police asked where the goods came from, the convenience store guy should say flea markets or store closings. Do I recall those facts correctly? Sure. Absolutely, there was testimony from Mr. Woosle. Why isn't that enough to show then that Suede was an organizer or a leading member of the conspiracy, so he's responsible for what co-conspirators did to facilitate this conspiracy, essentially to fence stolen goods through a couple layers of intermediaries? Because when you either have to have one of two things. If you're going to go under direct liability, the specific crime that we're talking about is the December 27th shipment of alleged stolen goods to New York. If you're going to go under direct conspiratorial liability, that is he agreed that this shipment would be made, the government doesn't contend that he had any knowledge of the shipment at all. There's no evidence of that. I think their theory was more that it's an ongoing scheme that he was responsible for. Well, what's clear is they've got to rely on the Pinkerton Doctrine. That is to say there's no evidence that he agreed. Yeah, but what's the matter with that? Well, let me just quickly. They have to rely on it because there's no evidence they agreed or knew or intended that this shipment would be made. So you're over to the Pinkerton Doctrine. The Pinkerton Doctrine, as instructed on by Judge Jensen in this case, reflecting the indictment, said that in order to apply the Pinkerton Doctrine, you have to find that the crime was committed by a member of the conspiracy. And there is, the government cannot point to a shred of evidence that this crime was, let me air it, be more specific. You have to find that the crime was committed by a member of the conspiracy named in counts 2 to 25 in the indictment. It was one person who was named 2 to 25, which was Soufian. The jury did not convict Soufian on count 25, nor can the government point to one shred of evidence that Soufian had any role in the count 25 offense. So what we're talking about here, Your Honor, is there's plenty of evidence offered, you know, of an overall sweeping conspiracy. There is no evidence that this defendant knew of any specific crime to be committed on count 25, and there is no evidence that the shipment on count 25 was made, intended, or known about by any member, named member of the conspiracy, which is Soufian. So we simply, the Pinkerton Doctrine was instructed on. The government can't point to any evidence that both Mr. Suede and Mr. Soufian were members, both members of the conspiracy at this time, and Mr. Soufian committed the crime. So that's the real problem, Your Honor. The jury happened to convict on one and only one count of ITSP, and as to that count, there's no evidence that the defendant knew about it or intended it, and there's no evidence that it was committed by another named member of the conspiracy. That's the insufficiency argument in a nutshell, Your Honor. Moving now, I think this constructive amendment argument is interesting, and let me use a hypothetical. The ITSP statute was originally a car theft statute, an interstate car theft statute. So let's use a car. The government charges in an indictment that the defendant drove a 1986 Chevy across State lines knowing it was stolen. That's in the indictment. There's some question whether the 1986 statute, Chevy, was worth $5,000, which is the jurisdictional requirement of the statute. The government says, well, let me, let's offer some other evidence, and it's not a question of admissibility. The fact is that the trunk of the car was filled with stereo consoles, all of which were stolen, okay? And the value of those exceeded $10,000, so you can get to the jurisdictional amount. If you find it on the Chevy, fine. If not, you can find it on the consoles alone, or you can consolidate the two, the consoles and the Chevy, to get up to $5,000. That's evidence that was never in front of the grand jury. It isn't mentioned in the indictment. In this case, we know, there's no dispute about it, that after the defendant was indicted for transport of stolen property, the government did another raid, found another alleged source of stolen property, put in plenty of evidence about that. We're not disputing the admissibility of the evidence. But what the government did quite clearly, and there's no dispute about this, is that it used a method of getting up to the $5,000 jurisdictional total by saying, well, it was either Musla, who starts in the indictment, or Abushi, who supplied the stolen goods. We offer no evidence as to whether Musla came up to $5,000 on this particular account, but it doesn't make any difference because we're contending that one way or another there was at least $5,000 of stolen goods. That is a constructive amendment. You can't convict somebody. You can put in evidence of uncharged offenses, but you can't convict someone of an offense upon which no evidence was placed before the grand jury, which is the constructive amendment argument on 25. That, of course, would not result in an acquittal but a new trial as to that count. Turning to the end, you know, admittedly, the jury's verdicts make this an interesting and complicated case. There are many times when the government gets to say, and will in a certain sense in this case, will the jury convict it? So, you know, that settles an awful lot of questions. Well, in this case, the jury didn't convict except on specific counts. That's why the argument on 25 is, I think, compelling. But let's turn to the structuring counts. Here's what we know. On structuring, I had some trouble with your argument on that. Let me tell you why. A lot of your argument is based on the fact that the bank did file a currency transaction report. But the crime is, as I recall, is not preventing a currency transaction report from being filed, but rather structuring transactions in order to prevent the currency. I agree. And if you structure the transactions to avoid it, but the bank files one anyway, they had trouble with its regulators or whatever, it doesn't seem to me that that bears very heavily. It's sort of weak evidence that maybe you weren't even trying. Well, it depends. It's like if you're trying to hit the golf ball onto the green and you don't get to the green. No, no, no. I'm with you. And here's the key fact that the government didn't tell you, and I'll tell you. Let's say you have a situation in which somebody comes in, goes into two different banks, or goes into the same bank at different periods of time, makes three deposits of $3,000. You've got evidence that they've said to somebody, I'm going to split these up. I don't want the $10,000 reported. And the bank is on its toes. It sees that the deposits were all made by John. That's basically what I thought happened here. That's right. And it does what they call a backroom CTR, right? All right. The CTR was issued, no thanks to the defendant, right? That's basically what I thought happened here. Right. Here's why that isn't what happened. Because in this case, the government says, and it's brief, he knew that multiple transactions, okay, would be added up and would result in a CTR. The evidence shows that he walked into the bank with the check, was identified by his driver's license. The timing on these are that it happened at the same time. He gives the bank his driver's license, and he gives the bank his Social Security number. Because the CTRs show that he walked in, he is the person who processed it. He gives them his driver's license. They take his Social Security number. The evidence in this case is that he participated in the submission of the CTR. He knowingly participated in that. I thought the evidence was that he had, prior to walking in with the check, manipulated the transactions in order to generate exchanges of currency without CTRs being filed. Well, again, Musla gives plenty of testimony that he was engaged, according to Musla, he was engaged in structuring. It doesn't make a lot of sense because he's writing out checks for all of these. He's creating an incredible paper trail of checks made out to Musla. It might make sense what Musla was to avoid the CTR. But let me use this analogy. Let's say there's a lot of evidence that somebody was involved in a structuring plot. And let's say it's beyond the statute of limitations, so there's no direct conviction on that. But there is two instances that are within the statute. And there's evidence about intent and blah, blah, blah. But as to those two instances, the evidence is that this individual goes into the bank, makes two cash deposits, and says to the teller, by the way, you know, I mean, I've made a deposit of four, or it's come to appear five from there. You should make out a CTR. No matter how overwhelming the evidence is, it's in general, you can't possibly convict on those two counts based on that evidence. And the evidence we have here, based on the CTRs, which are 271 and 272 of the ER, is that this individual walks in with two checks at the same time, drawn on the same bank account, gives his driver's license to the cashier because it's marked that he's identified by driver's license. The two checks are cashed in one instance. It's at 10.01, 10.09. Moosla endorses them. And the social security number of suede is taken and placed on the CTR. In that situation, Your Honor, I submit that the fact that the CTR was completed has tremendous evidentiary significance because it's a personal participant. As I said in the brief, and the government doesn't kind of predict it, there is no instance that I have found where somebody was convicted of structuring for writing out checks. I mean, you know, if I get a check from a client, I don't have to do any report on it, whether it's if I get two checks, whatever. It's not a cash transaction for me. Now, it is a cash transaction because these are cashed, but they're cashed in front of the teller at the bank at the point that he identifies himself and gives the information necessary for the CTR. I submit, Your Honor, that no reasonable jury could find Lufiano reasonable doubt there. So you ask, well, then why didn't they? Why didn't they? And the truth of the matter is that these two counts are never mentioned by the government in its closing argument. The jury never learns, is told, that there are CTRs for these two counts. I mean, they're in evidence, but that fact is never called to the jury's attention. So it is difficult to say that the jury, you know, considered the relevant facts and rejected them for an alternate explanation. And we do make a second argument here. I mean, granted, there were multiple counts, and counsel had to defend against them, and as to other counts, there weren't CTRs, so we had to make a global argument, and it was largely successful in the sense that all of the counts that didn't involve CTRs, apparently, there was no verdict on. These were the only two. But once his client was convicted, I submit that there was absolutely no reason to point out to the court, which had never been told this by either of the parties, that there were CTRs for these counts and that he was identified by his driver's license and gave his social security number. If the court feels that it cannot accept an insufficiency argument under the demanding Jackson v. Virginia standards, the question is whether Judge Jensen, who has a much greater power than this Court does over Rule 33 to weigh the evidence, ought to have the opportunity to have these arguments presented to him on a renewed Rule 33 motion on a remand. It's possible that he's going to say, nonetheless, I feel that the evidence weighed the other direction, but he, Judge Jensen, indicated on Rule 29 that he thought the evidence on the structuring was weaker, and he has essentially, all of the facts that I've detailed in the brief and detailed to the court about the driver's license and the social security number were never presented to him on a Rule 33 motion. Help me on another detail here. On the sufficiency of evidence, it's true that Al-Khalidi was the only person, other than Swade, specifically named in Counts 2 through 25. And it's true that Al-Khalidi was found not guilty. He was acquitted, right? No. As I stand here, I'm not sure whether he was acquitted. He was not convicted of anything. I can't remember. There were some things where it was a hung jury. Yeah. It may be that the jury was hung on every count against him. He was not convicted of it. But I can't represent to the court that I'm sure that he was acquitted on that count. Even if we were to assume that we should take it as though he was, as I remember Counts 2 through 25 all incorporate by reference Count 1, and Count 1 also names this Moslau Mari fellow. So why couldn't the jury convict on Count 25 by saying, well, he conspired with Moslau Mari? Well, there is actually no evidence in the record at all, and the government has never contended there is, that Moslau Mari was aware of and participated in ITSP offenses, knew of ITSP offenses, was involved in them. There's certainly no evidence that he had anything. I get the names mixed up. Was Mari the fellow who was buying the stolen goods from the drug addicts? Yes. Right. And what about the other person named in Count 1, which is Rosemont Wholesale, Inc.? Why couldn't Swade be convicted of conspiring with Rosemont Wholesale, Inc.? Oh. We're talking – you're raising an interesting question on the – It's a separate person. It's a corporate person. Well – Not a natural person. Well, whether a corporation can be considered a separate person for the purposes of the Pinkerton Doctrine – Why not? It's a legal person. Why not? Is there any authority? I will confess that this being a claim that the government has never raised at trial or in this court, I have not researched the question of whether a corporation can be considered a person for the purposes of the – I believe that – It sounds funny where a guy owns the whole corporation. He started it and all. But I'm thinking, suppose I'm a crook and I own some shares, so I'm somewhat involved with, but I didn't create and I don't own all of the shares of some corporation. I don't quite see why I couldn't conspire with that corporation, which is somewhat at arm's length to me to commit some crime. Well, let me take this position, Your Honor, that a corporation cannot be considered a conspirator for the purposes of the Pinkerton Doctrine. Have I briefed that? No. Has it been raised? No. Would I be delighted to provide the Court with some authority on that? Our position, you know, would be – the Court is saying that persons named in 2 to 25 necessarily incorporates all of the allegations in one, and the issue is whether the – you would – and it gets into questions as to who can be considered – I mean, a corporation can only be found guilty through the actions of its office. But corporations get convicted of felonies now all the time. I'm involved in a big criminal antitrust case right now, but I submit, Your Honor, that I believe that you have to have individual liability on the part of the officer of a corporation. We may or may not get there. You're over time. Okay. Let's hear from the government, and we'll give you a minute to respond. This is interesting stuff. Thank you. May it please the Court. Good morning. My name is Laurie Gray, and I represent the United States. None of the issues defended in Gray's merits reversing his conviction. I'd like to begin by looking at the sufficiency charges right out of the box here. To begin, as this Court knows, the en banc decision of Nevels dictates that the evidence must be viewed in the light most favorable to the government. And following that deferential review, Nevels says that on what it calls – We know the generalities. Why don't you just go through the evidence? Sure. The record in this case shows that as to the ITSB count, count 25, there's abundant evidence that the defendant knowingly caused stolen property to be shipped across state lines under any theory of liability. Principal, aiding and abetting, or Pinkerton. Okay. On the New York shipment, let's see. He was out of the country then? He was. Beginning in about 2004, he traveled extensively. Okay. So he's out of the country at the time of the shipment. There's no evidence he knew anything about the individual shipment when it was being made, right? The evidence is that he put in place all the different things to do that, send the shipments. Hold on. Try to listen to my questions. Sure. I'm trying to build it step by step here so that I understand it. Is it true that there was no evidence he had any particularized knowledge about this shipment? I would agree on that particular day. That's what I asked. Yes. Okay. Now, he's supposed to have conspired with one fellow on whom the jury hung, and also with the ‑‑ if count one is taken account of, with another fellow plus the corporation. Is that correct? That's correct. But count one is a little broader than that, Your Honor. The indictment, which is the excerpt of record 294, count one talks about that Hassan, Sway, Sufian, and Rosamond didn't knowingly conspire with each other and other persons to commit offenses. So it's not simply limited to the defendant in this case. And just to make clear for the record, the jury hung on every count with regard to Sufian. There was not an acquittal. The defendant put things in place. And there would be an inconsistent verdict if they thought A conspired with B, but we can't decide whether B conspired with A. And as you know, Your Honor, a hung verdict means nothing other than that the jury couldn't decide. I mean, case law is clear that it could be that they didn't get along, that they were tired, there's a whole host of reasons. But what this Court should focus on is the decision that the jury made. And the evidence that was presented, Your Honor, established that the defendant ‑‑ Can a verdict be upheld where a person is accused of conspiring with somebody who was charged with but not convicted of the conspiracy? Yes. I suppose it can. And I sent you a 28J letter on that. I suppose it can. Yes. I sent you a 28J letter last Thursday citing the Supreme Court case Standenberg that I submitted. That was contrary to what the defendant had cited, saying, I mean, Carroll, a case from 1950, hadn't been effectively overruled by Standenberg. I guess it's no different in concept from being convicted of conspiracy with an unnamed co‑conspirator. Correct. Okay. The evidence established that the defendant, as the President, the CEO, the CFO, the Secretary, and the Director, put in place when he started in the year 2000, these specific procedures and practices that allowed the company to ship and deal, they were trafficking in stolen goods. As Your Honor pointed out, when the defendant first began, he went to, and I pronounce it Mosley, went to Mosley's store, saw the shoplifters, the boosters coming in, selling the goods, getting paid. As a matter of fact, Mosley was, excuse me, the defendant was so hands on, he told Mosley specifically what type of products to get. He needed baby formula and he needed a certain kind of baby formula because that's what they could move under the WIC program. The defendant is the one who put in place separate books that you have to have, you have to split your invoices. If it's over $10,000, I want that split. He did that with both Mosley, who's the Amaris, and he did that with the Ibushi's. An employee testified at trial that in the year 2000, it was the defendant who went and picked up those Tuesday afternoon runs of stolen goods from the Ibushi's and that in the year 2000, when defendants started, he was there in the morning for the Monday through Friday deliveries. That was the testimony from Wadila Amadi. So the defendant was involved with sorting, putting into place the account sheets. Mosley. I think at this point you're proving some things that are not at issue on the appeal. Okay. I will, my point with all this. Okay, now lay out the facts on the structuring. On the structuring. One thing that I want to make very clear on the structuring is there is no evidence that the defendant was in the bank on those CTRs, despite strong testimony that that's a fact the government told you. As a matter of fact, the evidence shows the defendant was not in the bank. Mosley testified at trial that the defendant would give him two checks if anything was over $10,000, which irritated Mosley because he wanted to go about his business. As a matter of fact, he's asked several times about that particular piece put in place by the defendant. In an excerpt, supplemental excerpt of Record 277, he's asked, Mr. Amadi, if you brought him more than $10,000 worth of stolen merchandise, he goes, well, he'll be paid with one check. No, never one check. How about if your brother brought him more than $10,000 worth of merchandise? They always give us two checks. Did Hassan Sway say anything to you? This is supplemental excerpt of Record 278. Yes, he said, for my own safety, for your own safety, for both sides. He said, for your own safety, both sides? Yeah, from the bank filing paperwork. He said, the bank filing paperwork? Yes. Did you know what he was referring? I guess the form of the bank. If you have $10,000, you have to fill out the form. Did Mr. Sway talk to you about the form of the bank? Yes, he did. What did he say? He said, you know, avoid a problem. It's a secret for all of us. And then on cross-examination, it becomes clear that this will be irritated mostly because defense counsel asks him and says, now, earlier today, you talked about a conversation with Mr. Sway. Do you remember that testimony? Yes. Okay. When was that conversation? In his office? Do you remember what year? 2003, 2004, somewhere in there. This is that supplemental excerpt 320. And then he says, okay, what was the form that he referred to? He said, for our safety. Every time I ask him, you know, he tells me that's for our safety, you know, to avoid the bank, to avoid the form. So you would ask him, every time you ask him this, two checks. Why two checks? Why two checks? You asked him a lot about that. Yes, I didn't want to go through it. I just want to go to one bank. I don't want to waste my time. Nor did the defendant want to waste his time. The evidence at trial was that on two separate occasions, surveillance followed the van from Mosley's business to Roselant, where it dropped off the goods, and then followed the van from there, again, with just the driver, not dependent on the car, to the bank, where Mosley would cash the checks, and then back to Mosley's business. This is an excerpt of record three, or excuse me, it's in the reporter's transcripts, 3RT258 and 6RT1157. Now, with regard to the two specific checks, count 28, count 31, the defendant signed both checks, and he did. The testimony at the trial that he signed every one of the checks, and both checks were written on the same account at the same date, one to Mosley, one to his brother. The memo line said Abdullah Purchases, and the conductor, yes, Your Honor, in the second box, it lists Hassan, the defendant. Now, the testimony at trial was specifically asking about how these CTRs were generated, as I know Your Honors are aware of, because it was referred to, is the back room CTR, and that if, in fact, they didn't catch it with the teller, that if two people came in and cashed these checks, then what happens at the end of the day, the bank, in its auditing procedure, aggregates those checks, and the CTR is issued. There's testimony on that record, and that took the record to 199, about what a back room CTR is. Mr. Lippis, who is one of the other witnesses at trial, was asked about that second section, and he's asked about the individual conducting the transaction. Tell us about that. He says that section is filled in only when the individual who is conducting the transaction is different than the person who is on behalf of the transaction occurred, so it could be a swaper in the bank, or if the information is not available as far as the conductor is based on multiple transactions aggregated at the end of the day. Your Honors, the evidence in this trial showed that these were back door CTRs, that they weren't caught. That was defendant's intent to invade by splitting these up. At the end of the day, they aggregate, and they put on there who would have been on the account. The evidence at trial showed the defendant was the account holder for these banks, and that's the reason that information is on that. There is absolutely no record. There was no testimony during the trial to say that the defendant went with Mosley to the bank. So to say that the government has kept that fact from you is completely disingenuous because that fact was never testified to. As a matter of fact, the evidence shows just the opposite. What about the driver's license? That would be, as I understand it from the testimony in trial, that information would be on the account holder, and the defendant was the account holder on each of these banks. He was the signatory, the counselor in his favor. Why would the driver's license even be referenced? I mean, driver's license is ordinarily what's produced when they want identification. I don't have an answer to that, Your Honor. All I know is that when they're doing the aggregate, when they're aggregating the CTRs, they put on whatever information they have in regards to the account. As far as I'm aware, my bank has no knowledge. It knows lots of things about me, but I don't think they know my driver's license. I've never seen my driver's license number on any document I've ever seen from my bank. Was there actual testimony, or are you just assuming that the bank got his driver's license number when he opened the account? Well, the testimony from Mosley was that when they got these, they went to get hot cash from the defendant's neighborhood, and the testimony was that when they aggregated them. You now are answering a question other than the one that I asked. That's right. Well, I would really like to know the answer to the question I asked. Was there or was there not testimony that the bank got his driver's license number when he opened the account? And I think you just said you don't know if there was no such testimony. No, there was no testimony. I'm not aware of my familial connection. So why isn't the fact that they got his driver's license sometime, and it shows up on this CTR evidence conflicting with the evidence that he was not in the bank? Because the facts and the testimony by Mosley was there. Well, the bank, the jury can think Mosley's a liar. You're correct, Mosley did. The jury was the credibility determiner, and they obviously believed him with regard to the four accounts because he was a prime source of the facts, the four accounts on which they convicted. And they all like him, likewise, with regard to the defendant. He was not acquitted of any counts. But as I understand it, you're better off, from your argument, if Mosley's telling the truth, that he was there by himself, right? That's the testimony, yes. So from your standpoint, you want the jury to believe him. Yes. And again, the jury did, and as Your Honor pointed out, whether or not CTR's profile has absolutely no bearing on the counts, or excuse me, on the elements of the offense. And I cited to the court the Van Allen case, where the Seventh Circuit said whether or not the defendant actually fooled the bank has no bearing on his intent to evade. And that's clear from the testimony of Mosley that, indeed, the defendant had the intent to evade. And the defendant also told another lie to defend to Mosley, and that he'd say, well, another reason I have to have two checks is because the accounts don't have enough money in it. And the testimony and trial by the expert that testified and had evaluated all the bank accounts was that there was sufficient funds in all these accounts every time for the checks to be cashed at the same time. And thirdly, the two primary accounts, the only accounts charged, we're talking specifically in Count 28 and 31 Bank of America, had overdraft protection. So even if there wasn't enough funds, but there was, that would have been covered by that. All of that evidence shows that the record has sufficient evidence to support the jury's finding that the defendant structured the payments with the intent to evade. The same is true with regard to the conspiracy conviction. As the court knows, the conspiracy is broader than the substantive charges. The substantive offense, which may be the object of the conspiracy, may not be completed. Instead, the conspiracy focuses on whether an overt act was completed. The final account that the defendant raised had to do with the ineffective assistance of counsel. I'm happy to answer any questions that the Court may have with regard to that or any other questions with regard to the record. If there are no further questions, I'll submit. But if there's anything else you'd like me to discuss. I'm okay. Thank you. And I'd ask you to affirm the four convictions in this case. Thank you very much. Mr. Reardon, would you like a minute? Very briefly. No, hang on. We can wait until she sits down. I require a quick reference to the ER. ER 268 is a CTR. What the government expert explained is that the individual conducting the transaction is the person who comes into the bank. So in this case, it's Mr. Amos Saban. They checked his driver's license and it didn't identify him. And if you go to 270. That CTR says that Swade was the person who came into the bank? No, no. I'm making an example here. He, the government expert said the conducting part is the person who came into the bank. So at this count, which is not one of the counts of convictions, it's Mr. Saban. He came into the bank and he's identified by driver's license. Ah, Mr. El-Mahdi. On this count, again, not one conviction, he comes into the bank and he's identified by driver's license. So if Mr. El-Mahdi is there cashing these checks and they identify him by his driver's license. But then we go to the different counts of convictions. Who is the person who is in the bank and gave us the driver's license? It is Mr. Swade on both counts of conviction. That is the only evidence offered in this case on what happened on the charge of conviction. Musleh never said at all on 28th or 31st. I don't know by myself. The only evidence is that, um, that Swade is there. He's identified by, uh, the license. And in our statement of facts, we point out that on one of these counts they showed that Musleh endorsed it. Musleh was with him. And, uh, one, he said, endorsed it with a 10-01, 10-09. In other words, they come in, they do a transaction. Both checks are cashed. Swade identifies himself by driver's license. The government says he knows that he'll be in the CTR, uh, if he gives, uh, two checks. That's their argument. They offer evidence that, uh, he knew that from a previous transaction. So the only evidence is that a guy who knows that if he writes two checks and told more than 10,000 that he'll be in CTR goes into the bank with, uh, Musleh. He actually gives the checks to him. Gives him the driver's license. Gives him the social security number. And on those facts, Your Honor, which weren't pointed out in the jury, that's, that's a very specific and narrow ground on which we say that the evidence was insufficient. Why, why use two checks? Mm-hmm. Was there an explanation of why two checks instead of one? Well, they, they were written out to, uh, two different individuals, he, he and his brother. But as the government expert says, look, you can write out two checks for any reason. You can write them out for no reason. The only thing you can't do is write them out for the specific reason of avoiding the CTR. And as to these two counts, uh, there's no evidence that, that the purpose of this could have been to avoid CTR given that he was in the bank, cashing the check, giving his driver's license, giving this to Musleh, and, and giving information that shows up on the CTR. Okay. Thank you. All right. Thank you very much. The case of United States v. Suede now submitted. Uh, that completes our argument for this morning. Uh, and I remind everyone here that Judge Hugg, who has not been able to be present, will listen to the case of all the arguments. Thank you. We're now adjourned. All rise.
judges: Hug, Kleinfeld, Fletcher